Good morning, Your Honor. May it please the Court, I'm Jim Bisno for Lorenzo Gonzalez, who is a 43-year-old man who was employed as a janitor, park custodian for L.A. City, and he ended up getting 300 months, which is 25 years. Now, he was convicted of racketeering, which generally has a maximum of 20 years, but you can get more if the underlying racketeering carries life, and the penalty for the underlying racketeering in the state court carries life. And here he was charged with two conspiracies, which supposedly would carry life in California, conspiracy to murder rival gang members and conspiracy to kill a person named E.C. or Edward Clark. Our position is that the jury was misinstructed on the crime of conspiracy to kill murder rival gang members, and that in any event, the evidence was insufficient constitutionally on either charge. And I just wanted to quickly talk about the conspiracy to kill rival gang members, which in our view actually encompassed nine separate conspiracies. And despite the fact that we repeatedly asked the district court judge to force the government either to elect which conspiracy it was going on or to require the jury to unanimously agree on the discrete acts, which form a conspiracy to murder. The judge did, over the government's objection, instruct the jury that it had to agree on the persons to be, it was the goal of the conspiracy to murder, person or persons, right? So what is it, and that seems to me to be the critical part of the conspiracy. So what do you mean? You mean over at Axe? What do you mean? I mean the discrete conspiracy, because there's nine different ones. In our view, when the judge said to the jury, well, you have to agree on the victim or victims unanimously, that really didn't mean anything. It was a half solution. I don't understand why. If a conspiracy. Just a minute. Just a minute. I'm sorry. If the conspiracy is to murder someone. Yes. The goal of the conspiracy is to murder someone. And you have to agree on who the someone is. Have you differentiated the conspiracies from each other? Your Honor, I would say no, because the victims have no name. So the jurors could say, yeah, we all agree it was a rival gang member. Or they could have all said we all agree it was BMS, but there were four different conspiracies charged with being BMS. It seems to me that the Sixth Amendment rights. How do you get by the cases, Hoffas and the Chen Chang cases? Don't those essentially say that jurors don't have to agree on the specific person or the specific overt? I think Hoffas was an overt act case. As long as there's unanimity that there was an overt act or that there was a conspiracy to murder. How do you differentiate this case from those cases? The cases cited by the government, it seemed to me that in those cases it was clear what conspiracy was being talked about. There was a clear act by the defendant. He wanted to kill someone. In one case, he didn't kill the right person. In another case, the person who talked him into killing had died. But in any case, there could be no dispute as to what the act of conspiracy was. But here, Your Honor, we have nine separate ones. Just let me ---- When you say nine separate conspiracies, tell me what you're referring to. Well, for example, March 8th, 2010, that's supposedly Hood Day, my client supposedly says, in case the fags come through, have your shit ready. That fags is Florencia. March 30th, a homie had been shot supposedly by the Peptos, which Peptos is Pueblo bishops. He says, get a rascal and have your guns ready. April 25th, another homie having been shot by Big Macs, which is Berrio Mojadas BMS. He says, stay on the alert for Big Macs. So as I see what you're ---- so from the government's perspective, each of these were overt acts toward one in perpetuating one overall conspiracy. And I understand that, Your Honor, the district court did adopt that. It said there's an overarching conspiracy. But not ---- Well, let's say if you have a ---- I mean, I was thinking about this. I mean, this seems a little unusual. But if you have a conspiracy to traffic in drugs, right, over a five-year period, you don't have separate conspiracies every time there's a drug sale. That's true, Your Honor. And why isn't that the structure of this case? Because the State law under which his sentence is going to be enhanced requires the intent to agree, the specific intent to agree to kill, and the specific intent to murder, and an overt act. I understand that. But does it have to be ---- why does it ---- why does that mean that there has to ---- I understand that. But does it have to be a conspiracy to specifically intend to murder a group, a class of people, i.e., anybody who is from a rival gang who comes into your territory? I think that could be a conspiracy to violate somebody's civil rights. But I don't think it's a conspiracy to murder under ---- Well, tell me why. What is there in the State law that ---- Because you have, in order to have the specific intent to agree and to kill and to make sure you're not just talking, which the testimony was by the experts that there is such a thing as wolfing, exaggeration, machismo, in order to make sure that there is a real actionable California murder, there's got to be some victim, there's got to be some person who's intended. So if you're just sitting there saying, yeah, if they come in, let's spray them, but there's no them, there's no person, there's no object, there's no person ---- Well, I mean, one thing that was a little odd in this case is I don't think it ever came into evidence who was actually killed. Well, no one was actually killed.  It's a conspiracy where no one was killed. I understand that. So suppose instead of what we have here, we had a situation in which there was the same conspiracy alleged, but you had, you know, five bodies. Would that make a difference? Yes. That actually is the Vargas case, I think, which was a complicated mafia of prison conspiracy. If you have definite bodies and just have someone dead, then the jury can say, yes, they intended to kill that person. There's a person dead because of this conspiracy. Well, but that ends up ---- I've tried cases like that. That ends up a different count. That becomes a specific count, a biker murder specifically directed at the person who's murdered. So you have a separate count for that. But where you're dealing just with the conspiracy count, which is what we have here, where you don't have an actual effectuated murder, the object of the conspiracy, it seems, could be multiple. It could include someone who is actually killed, but it could also include many people who don't get killed. Why not? Well, I mean, the conspiracy is effectuated upon the making of the agreement. You don't actually have to kill the person. So, and, you know, we have somebody named Speedy here. I think there was evidence that they intended or expected to kill Speedy. So there's one. Then you have these other folks. Well, but we don't ---- The Sixth Amendment argument is that we don't know which the jury agreed on. And ---- Well, we know they agreed on Edward Clark and that they hung on Angel Torres. Yes. Right? Doesn't that undercut your argument? Well, those were two specific people. And I think it supports my argument that they could agree and disagree when there's a specific victim alleged and the court guides them. If the government chooses to allege nine different conspiracies, it's our position that the court has to ensure that it's not just talk. The court has to tell the jury, look, you've got to elect. If they're not electing, then you've unanimously got to agree on which of these telephone calls is supposed to be the conspiracy to murder. I mean, as a functional matter, because unless we were to reverse the Clark conspiracy, the other one doesn't much matter. I mean, I assume you might get a reversal, but you're going to end up in the same place, no? I'm sorry, I didn't ---- If the Clark ---- given the Clark conspiracy conviction ---- Oh, yes. The broader one resulted in the same concurrent sentence, right? Yes. But I believe if the court were to overturn the conspiracy against gang members, it would have to be reversed and returned because ---- Right. And is there any good chance you're going to end up anywhere else?  I understand what you're saying, and you're right, but in fact, they're redundant. Well, there ---- I think the district court undoubtedly arrived at a sentence in consideration of the jury's ---- But he could take into account all that behavior in the sentencing. He could, but I would argue ---- I'll be there to argue against him. Yes, Your Honor. Well, the government has confessed error or admitted error on the point of the sentencing right on counts two and ten because I think the judge said 300 months on all counts. Yes. Really, it was only 300 months on count one. Yes. The recall conspiracy. So it goes back ---- It's going to go back anyway. Anyway, right? Yes. Could I just say one more thing? To me, what I've tried to put forward in the brief and what I think our position is, is that because there are so many gang members in Los Angeles, I think there's like 120,000, which is like a small city, would be the second biggest city I was looking at in Rhode Island, if it was the city over there behind Providence. You know that all 120,000 people don't think the same. You can join a gang and you can be a gang member where you might be mouthing the words, oh, yeah, our rivals come in, we're going to get them. But you might not actually intend to kill them. You might not actually really want anybody killed. You might just be talking ---- But the evidence here on the phone calls was more specific than that. I mean, it was, you know, a bunch of specific incidents where they said, you know, they're over there, get them a gun, whatever. Well, I don't see that as so specific. Where someone says the Big Macs are there, they're deep. And somebody says, yeah, it would be great to spray them right now. I mean, who knows what they're talking about, where they're talking about. I think it's likely they weren't even talking about something that happened that day, but maybe a day before. I think a lot of it was just talk. And I think that the California law, which specifically gives 25 to life, but only where all the elements of intent are met, is specifically designed to avert the case where someone's just talking. And to make sure if you're going to get a life sentence, it's because you did more than talk. You really had in your mind the intent to kill some person. Right.  Thank you. May it please the Court. Jenny Wang on behalf of the United States. I want to narrow the scope of the discussion from the 120,000 gang members in Los Angeles to the 53 that were originally charged in this case as members of the 38th Street Gang. And by the time the first superseding indictment came down, there were 42. And 42 were charged in the RICO count, one of which was defendant. And there were only 10 defendants that were charged in count two, the Vicar Conspiracy to Murder rival gang members. And six defendants charged in the Conspiracy to Murder Angel Torres, one of which was defendant, and four defendants charged in the Vicar Conspiracy to Murder Edward Clark, again, one of which was defendant. So the government narrowly tailored the Vicar Conspiracy to Murder count to those who clearly conspired to murder rival gang members and also undertook overt acts in furtherance of that conspiracy. Defense counsel refers to nine separate conspiracies. The government isn't exactly clear on which nine he's talking about. But if you dial down in the evidence presented at trial and specific instances and specific victims whose death was contemplated by the overt acts undertaken by both defendant and his co-conspirators, you can see how there was one overarching conspiracy to murder any rival gang member who came into the territory of 38th Street in order to protect its territory. Let me go, I'll just list some specifics for you by illustration. In GR 467, Isaac Alvarez testified that in July 2009, he got into a fight with a Pueblo Bishops Blood rival gang member at the probation office, and he got beaten up. So Alvarez went to defendant and said, hey, I got beaten up. I need a gun. I want to go and shoot him. And defendant said, go to Caps' house. He has a gun for you. That's an instance of defendant actually committing an overt act, although, as you know, the law is that either defendant or his co-conspirators can do the overt act. And, again, there's another instance where at GR 495. But, you know, as I said before, there was very little evidence about anybody actually getting killed. You're right, Your Honor. There was no evidence of anyone being killed. Okay. So, I mean, that throws some kind of light on everything else that was happening here in the sense that if they tell somebody to go get a gun, but nobody actually, does anybody get shot? Well, you can see most clearly that one of the, take the Speedy instance, for example. As Detective Trujillo, the case. Well, that was unusual because there the police got wind of it, and they went and they were there. And so that might have fended it off. But we have no idea why the other ones, I mean, to use the other example you just gave. I mean, so he told him to go get a gun. We don't know that he got a gun. We don't know that he shot anybody. He apparently didn't shoot anybody because I assume there would have been evidence that he shot anybody. That at least throws some negative light on the notion that anybody really believed they were killing anybody. I actually think it goes more to the coded language with which they talked to each other and the familiarity that all the gang members had. No, no. I'm saying something else. I understand that they didn't directly say they were going to kill anybody. But, in fact, they also didn't kill anybody or even shoot at anybody as far as the evidence shows. Actually, Your Honor, I respectfully disagree. Isaac Alvarez's testimony is key in understanding what was actually going on on the streets. He actually testified that he himself shot at various people. In fact, one of them was. But not the people that were alleged in this conspiracy. Actually, yes. Like the rival gang members that he. All the shootings that he was undertaking were against rival gang members. He testified that he did so to impress the older homies in the gang, one of whom was defendant. And, in fact. But he didn't testify that any of the people, in any of the instances in which he shot at somebody, it was because the defendant gave him the gun or got involved directly in any way. Well, defendant wasn't the actual person who owned the guns and was procuring the guns and handed them to Alvarez. He was brokering. He knew where the guns were and said, hey, go to. But is there any connection between any of Alvarez's reported shootings and Gonzalez doing anything? Yes, Your Honor. So the instance I just described with the probation office fight, defendant said, go to Katz's house and get a gun. There's another one where. No, but where Alvarez actually shot anybody. Well, with respect to the bad boy incident, there was an incident where bad boy was a 38th Street gang member who was killed. Alvarez went to defendant and said, hey, I want to retaliate against the Pueblo bishops whom they believe killed bad boy. I want to retaliate against them. I want to get a gun. Defendant said, we got guns. Alvarez testified that Spooky G, another 38th Street gang member, beat him to it. So in that sense, defendant provided a gun. Alvarez was going to shoot one of the Pueblos. But the answer to my question is no. No. OK. Well, is it necessary, though, because it's a conspiracy? I mean, isn't the conspiracy what links the defendant to the overt acts committed by other co-conspirators? I mean, I think Your Honor is right. Unfortunately, with respect to these gang, the gang violence, you know, as Officer Cooney, the 38th Street gang expert testified, a lot of these murders go unsolved. And so you can't necessarily tie a shooting to a specific gang member or even decide, be able to determine which gang was the one who did the shooting. My question for you is, I understand defendant's point. I mean, there seems to be a kind of fundamental fairness issue associated with a biker count, where on one hand you have a specific target that's alleged, like count 10, I think, with Edward Clark. You can kind of get your head around that. But when the targets are kind of amorphous, just rival gang members, and then lots of information is thrown at the jury about all sorts of things said about, you know, we're going to get those guys and we want to kill those guys and, you know, yada, yada, yada. And now you're held responsible for a biker murder conspiracy count based on all of that kind of thing. It does seem to sort of challenge the Sixth Amendment concept. But I don't see how a panel of this Court could hold that in light of these cases that I asked counsel about, Hofus and Chen Chen. I think it doesn't require a specific finding as to each which overt acts. I mean, isn't that the law of the circuit? I mean, I think Your Honor is exactly right. And should there have been any – Well, is there a difference between – they certainly say that about overt acts. But do they say that about the object of the conspiracy? About the victims? Yes. Yes. Actually, the Vargas case addresses that head on. And it was the Nuestra Familia prison gang case. And, in fact, it's probably the closest analog to what's going on here. And the issue there was whether a specific unanimity instruction was required to be given regarding the victims of the crime. And in Vargas, the California court said that it was not necessary. But here the district court took that one step further and did give the specific unanimity instruction to – as the district – over the government's objection and to make sure that the inquit crime of conspiracy was not made more inquit. It actually cleared up any potential problems with duplicity or confusion with respect to the jury. Because, as Your Honor said earlier, if you agree unanimously as to who was going to be killed, then the overt acts and furtherance of that are also brought into clearer focus. I have a question about the minor enhancement. What evidence is there that Gonzales used a minor to commit crimes for which he was convicted? Well – And which minor? What crime? Which minor? Specifically Isaac Alvarez, who testified that when he was 16 or 17 years old, he shot at rival gang members in order to impress defendant because he was an, quote, older homie. Did Gonzales use him to do that, or he just did it on his own to impress Gonzales? Well, with respect to the term use, use the minors, there was – the structure of the gang was that older homies used all the younger homies to do their bidding. They were the foot soldiers. I'm asking specifically with respect to Gonzales. I know what experts say about how gangs work. Right. With respect to Alvarez specifically, there's no evidence that Gonzales said, hey, go shoot that person so that I'll be proud of you. I think to the effect that he sort of implicitly approved that afterwards he was told that I've been doing this, and he said, yeah, I may not be right about this, so counsel, correct me if I'm wrong, but he said, yeah, go ahead and keep doing that or keep doing that if you want to or something like that. If he wants to bang, let him bang. Those were the words that Gonzales – I think that you're referring to, Your Honor. And so that specifically perhaps – But who testified to that? Alvarez did testify to that. In fact, Alvarez, his friends in the gang were saying, hey, you should go low. Why is that evidence that – I mean, it sounds like he was saying if he wants to do it, let him do it, but why does that prove that he was behind it? Behind it or is it that he was encouraging these minors to do that? And that's how Alvarez interpreted it, and that's how he testified. Alvarez testified at trial that he was encouraged by defending Gonzales to do – Are you saying if he wants to do it, let him do it? Right, putting in work, as he referred to it. And letting bang was a term of art used to refer to the crimes that you commit in order to improve your station in the gang. So – and, you know, which also included violent crimes, tagging, extortion, et cetera, that were described at trial. It's pretty thin, but the standard is pretty low. I mean, that's the only evidence. The other evidence is stuff like using young – sort of general conversation about using youngsters or very amorphous kind of stuff, isn't it? Well, the government doesn't see it as amorphous evidence. In fact, because there were so many calls, it may seem in the aggregate to be amorphous. But when you actually dial down to the calls, they're pretty specific, where there's multiple instances where defendant Gonzales was wiretapped, calling younger gang members and saying, be very alert, have your shit ready, referring to guns, or tell him we need those PlayStations, ER-317. The little homies don't have no handguns. They need some. ER-356, he's trying to broker the sale of a brand-new assault rifle for $550. It's actually specifically that he's calling these younger members and arranging for them to have guns at the ready so that when the time comes, they can use them in furtherance of the gang's goals, one of which is to retaliate against rival gangs or commit violent acts against them. All right. Thank you, counsel. Yes. Just two quick points on Isaac Alvarez. One to Judge Berzon's question about the relationship between Alvarez and the conspiracy charge. Alvarez was arrested January 10th, 2010, and Mr. Gonzales, my client, wasn't the tap on his phone out of which the conspiracy allegations arose. That didn't begin until March. So Alvarez is in custody all the time during which the life conspiracies are supposedly taking place. The other thing I wanted to point out was as to the age. The government never produced evidences to Mr. Alvarez's date of birth. And that's where I see the flaw in the argument about him using a minor. One of the flaws, in addition to that which has been pointed out by the court, is that he said he was 19 in 2010 when he got arrested. So he was 18 in 2009. Maybe he was still 18 in 2008. We don't know when he turned 18. And it seems to me the Flores case demands that you actually have a date of birth or you have somebody say, no, I was under 18 at that time. And I don't think that that ever occurred in this case during Alvarez's testimony. It's basically conjecture. The word little homies might be someone ---- Alvarez didn't say I did that when I was 16 or 17? He didn't put the two things together. In other words, he didn't say that when I talked to Gonzales and Gonzales told me, if you want to bang, that at that time he was under 18 years old. He did say that he was 16 or 17 when he was committing some of the crimes. But he didn't ---- he was never directly asked, what's your date of birth and when was this conversation occurred? And it actually seems to me that that is a deficiency of the proof. Ginsburg. All right. Thank you, counsel. Do you think I have a question? Does the California Court of Appeal Vargas case address or is it dispositive of the question whether the individual ---- there has to be unanimity on the individual conspiracies? Well, I don't think it's dispositive. As I said, it appears to be dicta. Why is it dicta? It was not necessary to the decision. It seemed to ---- excuse me, but it seemed to govern what instructions were given. Excuse me? The judge says, I'm now changing my mind and I'm going to give an instruction where you don't have to actually have these individual conspiracies. Why is it dicta? Are you talking about our court or the Vargas court? No, we're talking about Vargas court. It's dicta because there the ---- as I tried to explain in the brief, it's there the judge, the prosecution had wanted the net unanimity. The defense didn't want to have it, so it was really a question of a waiver. And furthermore, in Vargas, it was clear that there were specific victims. They were green-lighting specific people. As I understand the evidence in Vargas, it was clear ---- The question is whether they had to be unanimous about who the specific people were. I'm sorry, Your Honor. The question is whether they had to be unanimous about who the specific people were. Yes. Right. Yes, that's correct. So therefore, the fact that there were specific people, there were lots of specific people, so that doesn't answer the question. Well, I'm just saying that in context of our case, Vargas doesn't apply because the facts are just completely different. And there was no need really for it. I understand in Vargas that the court did make that instruction and that there is language in Vargas that says they don't have to be unanimous. They talk about there being a split in jurisdictions. We think the better rule is you don't have to unanimously agree. Isn't the bigger problem with Vargas is that it was a society and constitutional issue, not a State law issue on this question? I'm not sure of that, Your Honor. I'd have to look back at that. All right. Thanks. All right. United States v. Gonzalez will be submitted. And we'll take up United States v. Margarita Vargas.
judges: Smith, Wardlaw, Berzon